Keith William DEBLASIO,
et al., Plaintiffs,

v.

Gene M. JOHNSON, et al., Defendants.

Ira Wayne Madison, Plaintiff,

v.

Ronald J. Angelone, et al., Defendants.

Richard Gutridge, et al., Plaintiffs,

v.

Gene M. Johnson, et al., Defendants.

Lian J. Ross, et al., Plaintiffs,

v.

Ron De'Angelo, et al., Defendants.

T. Understanding Allah, Plaintiff,

v.

R. Angelone, Defendant.

No. CIV. A. 99–1818–AM, CIV. A. 99–1859–AM, CIV. A. 00–18–AM, CIV. A. 00–170–AM, CIV. A. 00–211–AM.

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 25, 2000.

Keith William DeBlasio, Victoria, VA, pro se.

Donald Wells, Victoria, VA, pro se.

S. Batts, Victoria, VA, pro se.

D. Wilson, Victoria, Va, pro se.

D McBride, Jarratt, VA, pro se.

John Harris, Victoria, VA, pro se.

Eric Hobbs, Victoria, VA, pro se.

Nash, Danville, VA, pro se.

Pamela Anne Sargent, Rick Randall Linker, Office of Atty. General, Richmond, Va, for defendants.

## OPINION

HILTON, District Judge.

This case involves several constitutional and statutory challenges to the new Virginia Department of Corrections ("VDOC") inmate grooming standards regulation, Division of Operations Procedure 864 ("DOP

864"). Plaintiffs are inmates in the Virginia prison system who filed this consolidated *pro se* action under 42 U.S.C. § 1983, in order to launch a facial challenge to DOP 864 on First Amendment, Fourth Amendment, Eighth Amendment, Fourteenth Amendment, and Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb–4 ("RFRA"), grounds. Plaintiffs have also made several implementation challenges to DOP 864, based on the Eighth and Fourteenth Amendments. Plaintiffs have named various state officers and prison officials as defendants (collectively, the defendants). Plaintiffs seek compensatory, punitive, declaratory, and injunctive relief. Parties have now filed cross Motions for Summary Judgment on the constitutionality of DOP 864.

## I. Factual Background

DOP 864 became effective on November 15, 1999, with a mandatory compliance date of December 15, 1999. DOP 864 is modeled after the grooming policy implemented by the South Carolina Department of Corrections in August, 1997. DOP 846 applies to all inmates confined in state correctional facilities operated by the Virginia Division of Operations and by private operators under contract with the Department. There is no exception for inmates claiming that they cannot cut their hair for religious reasons. The policy is available for inmate review in the law library of each VDOC facility.

DOP 864 indicates that the rationale behind the promulgation of the grooming policy was to promote safety, security, sanitation and to facilitate the identification of inmates. Deputy Director of Operations for the VDOC, defendant Gene Johnson, by way of affidavit, expands on the purposes behind the creation and implementation of the grooming policy.[1] With regard

---

1. Plaintiffs do dispute the motives behind DOP. They, however, rest upon mere allegations and denials, and fail to set forth specific facts showing that there is a genuine issue for trial, which are insufficient to successfully challenge a properly supported Motion for Summary Judgment. *See* Fed.R.Civ.P. 56(e). Moreover, as the Supreme Court has indicated, "[i]t is obvious, of course, that bare allegations of malice would not suffice to establish a

to security, defendant Johnson states that longer hair provides inmates with an additional place to hide contraband; that inmates may use hairstyles to symbolize gang activity; and that shorter hair facilitates routine searches of inmates by staff because less hair requires less time to search. In addition, defendant Johnson indicates positive identification of each inmate is important in the event of escape from confinement: upon escape, an inmate can remove hair and drastically altering his appearance, thus making recapture more difficult. With regard to the somewhat different treatment of men and women under DOP 864, VDOC data and experience indicates that female inmates are not as violent as male inmates, and are not as prone to hide weapons in their hair to escape.[2]

DOP 864 requires that all male inmates' hair be not more than 1″ in thickness/depth. Moreover, with regard to male inmates, styles such as braids, plaits, dreadlocks, cornrows, ponytails, buns, mohawks, partially shaved heads, designs cut into the hair, etc., and any style which could conceal contraband, are not permitted. With regard to female inmates, female inmates' hair cannot be longer than shoulder length. One or two braids or ponytails are allowed, but hair must be kept out of the face and eyes. Styles such as mohawks, "tailed" haircuts, shaved or partially shaved heads, more than two braids/plaits/ponytails, dreadlocks, cornrows, designs cut into the hairs, and any style which could conceal contraband, are not permitted.

No inmates may have beards, goatees, or sideburns below the middle of the ear. A mustache is authorized; however, it must be neatly trimmed and must not extend beyond the corner of the mouth or over the lip. If an inmate has a medical condition that could be aggravated by shaving or complete removal of facial hair, the inmate must receive a "no shave" medical order from the institutional medical authority. Inmates who have a "no shave" medical order must continually trim all facial hair so that it does not exceed 1/2″ in length.

In addition, all inmates' fingernails must be neatly trimmed and cannot extend more than 1/8″ beyond the tip of the finger or thumb. Fingernails cannot be filed to a point; they must be rounded.

When inmates are initially brought into a receiving or parol violator unit, all receive haircuts and shaves on the same day they are received. If an inmate refuses to cooperate, use of force and restraints is authorized in order to bring the inmate into compliance with grooming standards. Thereafter, inmates are to maintain their compliance with the grooming standards in DOP 864.

Inmates who fail to keep their hair, and any permitted facial hair, clean and neatly trimmed, or otherwise fail to maintain good grooming and personal hygiene, can be charged with a minor institutional offense. Repeat violators can be charged with a major institutional offense.

Inmates who entirely refuse to comply or who chronically violate inmate grooming standards are managed as potential risks to institutional order and safety. Specifically, noncomplying inmates are to first be given an order to comply with grooming standards. If they continue to refuse to comply, they are to be charged with a major institutional offense and placed on

constitutional claim." *Crawford–El v. Britton*, 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). Thus, such allegations are not properly considered before the court in the instant matter and do not create a material issue of disputed fact.

**2.** In support of this contention, defendants in the instant case have filed an untimely Reply Brief under Local Rule 7(E)(1), which the court, as it is within its discretion, will consider in light of the cumbersome nature of this case. In the interests of equity, and because new evidence was submitted with defendants' Reply Brief, the court will consider Plaintiffs' Response to Defendants' Reply.

pre-hearing detention. Such inmates must then remain assigned to special housing and all visitation and telephone privileges (except legal), commissary privileges (except for those items specifically authorized for inmates on isolation status), work, and program activities are suspended until they fully comply with grooming standards.

Thereafter, a disciplinary hearing is to be held as soon as possible after twenty-four hours after service of the charge. Inmates found guilty are given a mandatory penalty of five days isolation for the first offense. On the fifth day of detention/isolation, if still non-compliant, inmates are given an additional order to comply. If such inmates continue to refuse to comply, they are charged again with an additional institutional offense and continued special assignment to special housing pending a hearing. On a second conviction, the mandatory penalty is ten days isolation. For a third conviction, the mandatory penalty is fifteen days isolation. One day prior to the expiration of each isolation penalty, inmates are given another order to comply and remain assigned to special housing until compliance is achieved. Consecutive isolation sentences may be imposed, provided that out-of-cell exercise is provided after the first 15 days, in accordance with the conditions of segregation.

Continued failure to comply after the third conviction may result in referral to the Institutional Classification Authority for assignment to segregation and possible reclassification to a higher security level institution. Inmates are not released into the general population setting, and their privileges are withheld, until they comply with the grooming standards. Moreover, such inmates are not eligible for reclassification to a less restrictive housing assignment (*e.g.*, release from segregation), or a lower security level institution, until they have complied with DOP 864.

In implementing the grooming policy, facilities that must abide by DOP 864 are to ensure that adequate hair care and barbering services are made available to all inmates, regardless of housing status, to meet the grooming policy.

## II. Analysis

In reviewing a Motion for Summary Judgment, courts must view the facts in the light most favorable to the party opposing the motion. *See Porter v. United States Alumoweld Co.*, 125 F.3d 243, 245 (4th Cir.1997). Summary judgment is appropriate where "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "genuine" issue of material fact is present "if the evidence is such that a reasonable jury could ... return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "When a motion for summary judgment is made and supported ... [by affidavits], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Moreover, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2725, at 93–95 (1983)). Because the court finds no genuine issue of material fact, the court will rule on the Cross Motions for Summary Judgment. Based upon the undisputed material facts before the court, the court grants defendants' Motion for Summary Judgment and denies plaintiffs' Cross Motion for Summary Judgment.

## A. Analysis—Facial Challenges

Plaintiffs challenge DOP 864 facially on First, Fourth, Eighth, and Fourteenth Amendment grounds, in addition to a challenge based on the RFRA. Each will be addressed in turn.

### 1. First Amendment

Plaintiffs have made First Amendment claims based both under the Free Exercise Clause and on Free Expression grounds. Each will be addressed in turn.

#### a. Free Exercise Clause

Plaintiffs' first assertion under the First Amendment rests upon religious tenets of the various faiths held by the plaintiffs that dictate that hair cannot be removed, in varying degrees, from the head and face. These faiths include Islam, Christianity, Rastafarianism, and Native American beliefs.

Plaintiffs have not contested defendants assertion that DOP 864 is modeled after the South Carolina grooming policy at issue in *Hines v. South Carolina Dept. of Corrections*, 148 F.3d 353 (4th Cir.1998). In fact, plaintiffs have not asserted any facts, either in terms of the requirements of DOP 864 or their circumstances, that suggest to the court that the instant Free Exercise Clause claim is outside the scope of the Fourth Circuit's holding in *Hines*.[3] Accordingly, for the same reasons articulated in *Hines*, the Court finds that DOP 864 does not violate the Free Exercise Clause.

The *Hines* court analyzed the South Carolina grooming policy under two tests formulated by the Supreme Court. *See Id.* at 357. Specifically, the *Hines* court applied the Supreme Court's holdings in *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (formulating

a "generally applicable regulation" test), and *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (formulating a "reasonably related to legitimate penological interests" test). *See id.* at 357. Each analysis, as applied to the matter at hand, results in a finding of no Free Exercise Clause violation in the promulgation of DOP 864.

■ First, with regard to the *Smith* test, a "law is considered neutral if it proscribes conduct without regard to whether that conduct is religiously motivated or not." *Hines*, 148 F.3d at 357 (citing *Smith*, 494 U.S. at 876–79, 110 S.Ct. 1595). The *Hines* court found that the grooming policy was implemented to help eliminate contraband, reduce gang activity, identify inmates, and maintain order in the prisons. *See Hines*, 148 F.3d at 357–58. As a result, the court held that, "although the [South Carolina] Grooming Policy may have an incidental effect of preventing the Inmates from wearing their hair and beards as their religion prescribes ... the Grooming Policy is a neutral and generally applicable regulation and, therefore, does not violate the Free Exercise Clause." *Id.* at 359.

■ In the instant case, the record reflects that, like the South Carolina policy, DOP 864 was implemented to help eliminate contraband, reduce gang activity, identify inmates, and maintain order in the prisons. Accordingly, although DOP 864 may have an incidental effect of preventing the Inmates from wearing their hair and beards as their religion prescribes, DOP 864 is a neutral and generally applicable regulation and, therefore, does not violate the Free Exercise Clause under the *Smith* analysis.

■ With regard to the *O'Lone* analysis, "a prison regulation that impinges on an

---

**3.** Several plaintiffs do argue that the instant matter is different from *Hines* in that the South Carolina grooming policy was supported by legitimate penological purposes, whereas the DOP 864 is based in improper

motive and intent. All such allegations, however, are baseless and vague, and therefore are not properly before the Court. *See supra* note 1.

inmate's free exercise rights is valid if it is reasonably related to legitimate penological interests." *Hines,* 148 F.3d at 358 (citing *O'Lone,* 482 U.S. at 349, 107 S.Ct. 2400). In order to conduct the reasonableness determination, *O'Lone* identified several factors relevant to this reasonableness determination: (1) a regulation must have a logical connection to legitimate governmental interests invoked to justify it; (2) the inmates should have alternative means of exercising their religious rights; and (3) accommodating the inmates' rights should not severely impact other inmates, prison officials and allocation of prison resources generally. *See Hines,* 148 F.3d at 358 (quoting *O'Lone,* 482 U.S. at 350–53, 107 S.Ct. 2400).

After assuming, without deciding, that the South Carolina grooming policy infringed upon the plaintiff inmates' sincerely held religious beliefs, the *Hines* court considered the three prongs of the *O'Lone* test. *See Hines,* 148 F.3d at 358. First, with regard to the first prong, *Hines* found that the record was clear that the grooming policy was enacted to suppress contraband, limit gang activity, maintain discipline and security, and prevent inmates from quickly changing their appearance. *See id.* at 358. Moreover, the court continued, "[i]t cannot be gainsaid that these are legitimate—indeed, compelling—governmental and penological interests." *Id.* at 358. With regard to the second *O'Lone* prong, *Hines* held that the inmates did not dispute that they were permitted to practice other tenets of their religion and that they therefore have an alternative means of exercising their religious practices. *See id.* at 358. Finally, with regard to the

third prong, *Hines* determined that the record showed that searches of inmates with long hair were more time consuming than searches with inmates with short hair, and accordingly, accommodating the inmates' religious practices may therefore result in increased contraband and less safety for guards and inmates, and require the hiring of additional guards. *See id.* at 358.

In the instant case, each of the *O'Lone* prongs are satisfied for virtually the same reasons.[4] First, the record is clear that DOB 864 was enacted to suppress contraband, limit gang activity, maintain discipline and security, and prevent inmates from quickly changing their appearance. Second, plaintiffs do not dispute that they are permitted to practice other tenets of their religions. Finally, the record shows that searches of inmates with long hair are less effective and more time consuming than searches of inmates with short hair, and accommodating plaintiffs' religious practices may therefore result in increased contraband and less safety for guards, even if it is not entirely clear from the record this would result in the need to hire additional guards.[5] Accordingly, DOP 864 passes muster under the *O'Lone* test as well.

Additionally, the court notes that plaintiffs' reliance on *Gallahan v. Hollyfield,* 670 F.2d 1345 (4th Cir.1982), is misplaced. "[T]he *Gallahan* test is no longer good law in this circuit." *Hines,* 148 F.3d at 359. Therefore, as the Fourth Circuit found in the virtually identical circumstances in *Hines,* the court finds that DOP 864 is not invalidated under the Free Exercise Clause.

4. As did the *Hines* court assumed, it is assumed for purposes of this Motion for Summary Judgment, that plaintiffs in the instant matter have sincerely held religious beliefs and that DOP 864 has limited their ability to practice these beliefs.

5. Plaintiffs have asserted that there are no time savings in searches of short hair versus long hair, but they do not claim to base this statement on a knowledge of time savings

across all facilities covered by DOP 864. Assuming that their assertions are true, and that their personal experience has shown that search time does not depend on length of hair, this still does not bring rise to a material dispute of fact. Plaintiffs have not pointed to any specific evidence that would cast that disputes defendant Johnson's assertion that search time is overall lessened by the implementation of DOP 864.

### b. Freedom of Expression

Alternatively, plaintiffs claim that DOP 864 violates their Freedom of Expression under the First Amendment. The plaintiffs' Freedom of Expression claim will fail for the same reasons articulated in the discussion of plaintiffs' challenge under the Free Exercise Clause. The Fourth Circuit has applied the same underlying consideration in *Hines* to other First Amendment challenges asserted by inmates. *See Altizer v. Deeds*, 191 F.3d 540, 547 (4th Cir. 1999) (applying the "reasonably related to legitimate penological interests" test to a Freedom of Speech question). Accordingly, for the reasons articulated above in the discussion on the Free Exercise Clause, plaintiffs' Freedom of Expression claim fails.

### 2. Fourth Amendment

■ Plaintiffs claim that DOP 864 deprived them of their right against unreasonable search and seizure under the Fourth Amendment. Generally, inmates do not have a reasonable expectation of privacy in the prison environment. *See Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Id.* at 527–28, 104 S.Ct. 3194. Moreover, the Supreme Court has held that the same reasons that support a conclusion that "the Fourth Amendment's proscription against unreasonable searches is inapplicable in a prison cell, apply with controlling force to seizures." *Id.* at 528, n. 8, 104 S.Ct. 3194. "Prison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests." *Id.* at 528, n. 8, 104 S.Ct. 3194. *Hudson,* therefore, determined reasonableness inquires into searches and seizures of inmates' cells are inconsequential, in that the Fourth Amendment's prohibition on unreasonable searches and seizures does not

apply in prison cells. *See id.* at 530, 104 S.Ct. 3194.

■ Accordingly, so far as seizure of property is concerned, plaintiffs argument fails. DOP 864 clearly identifies long hair and most facial hair as articles which disserve legitimate institutional interests, and are thus subject to immediate seizure. *See Hudson,* 468 U.S. at 528, n. 8, 104 S.Ct. 3194.

There is support, however, for applying a reasonableness inquiry in considering whether DOP 864 violates plaintiffs' privacy rights against unreasonable searches when an inmates person is at question. In such Fourth Amendment prison cases that potentially fall outside the scope of the *Hudson* categorical denial of Fourth Amendment rights, a reasonableness inquiry is conducted. In a case not dissimilar to the instant matter, the Fourth Circuit held that the collection and analysis of blood samples, for purposes of Deoxyribonucleic acid (DNA) identification, did not violate inmates' Fourth Amendment rights. *See Jones v. Murray,* 962 F.2d 302, *cert. denied,* 506 U.S. 977, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992). The *Jones* court weighed the intrusion placed upon inmates of taking of blood samples against the government's interest in preserving a permanent identification record of convicted felons for resolving past and future crimes. *See id.* at 307. *Jones* concluded that, because the blood drawing procedure involved virtually no risk, trauma, or pain, the minor intrusion caused by taking a blood sample was outweighed by Virginia's interest in determining inmates' identification characteristics specific to the person for improved law enforcement. *See id.* at 307.

■ In the instant case, plaintiffs' do not have a valid Fourth Amendment claim. Assuming, without deciding, that the cutting of inmates' hair is a search that is subject to a Fourth Amendment reasonableness inquiry, which it arguably is not, DOP 864 is nonetheless valid. As in

*Jones,* cutting hair and trimming facial hair involves virtually no risk, trauma, or pain. Therefore, the intrusion on inmates' privacy is minor, at the most. This minor intrusion must be weighed against the VDOC's interests. As the Fourth Circuit stated in *Hines,* suppressing contraband, limiting gang activity, maintaining discipline and security, and preventing inmates from quickly changing their appearance, are not just legitimate governmental penological interests, they are compelling. *See Hines,* 148 F.3d at 358. These are the precise interests behind the promulgation of DOP 864. The court thus finds that the VDOC's compelling governmental and penological interests clearly outweigh the minor intrusion caused by cutting inmate's hair. Accordingly, under a Fourth Amendment reasonableness inquiry, defendants' claim fails.

Accordingly, plaintiffs' Fourth Amendment challenge to DOP 864 fails.

3. Eighth Amendment

Plaintiffs contend that DOP 864 constitutes cruel and unusual punishment, in violation of the Eight Amendment, in that the severity of the repercussions an inmate faces for noncompliance are extreme. Specifically, plaintiffs claim that, because noncompliance with DOP 864 can result in segregation from the general population, in addition to a loss of recreation, telephone, canteen, and visitation privileges, combined with institutional infractions accruing once every fifteen days for continued noncompliance (thus effecting release date and custody level in the future), DOP 864 violates the Eighth Amendment.

 The Eighth Amendment protects against the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin,* 77 F.3d 756, 761 (4th Cir.1996). "In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" *Shakka v. Smith,* 71 F.3d 162, 166 (4th Cir.1995) (quoting *Strickler v. Waters,* 989 F.2d 1375, 1379 (4th Cir.1993) (quotation omitted)).

 In order for the deprivation to be sufficiently serious, a court must bear in mind that "the ordinary discomfort accompanying prison life is part and parcel of the punishment those individuals convicted of criminal offenses endure as recompense for their criminal activity." *Shakka,* 71 F.3d at 166 (citing *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Moreover, the Eighth Amendment "does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

 The subjective component is satisfied by demonstrating that the prison officials acted with deliberate indifference toward the deprivation. *Id.* at 303, 111 S.Ct. 2321. A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In other words, awareness of the underlying facts leading to the deprivation is not enough, the prison official must draw the inference that the prisoner is exposed to a specific danger. *Rich v. Bruce,* 129 F.3d 336, 338 (4th Cir.1997).

For the most part, the complaints put forth by plaintiffs, with regard to the severity of punishment for nonconformance, are better suited for discussion under a Fourteenth Amendment Due Process Clause analysis. This is especially true with regard to the levying of the institu-

tional infractions and that could conceivably affect release date and custody level. Accordingly, these issues will be addressed in the Fourteenth Amendment analysis to come.

 Nonetheless, in the context of a cruel and unusual punishment claim, the deprivations claimed by inmates in this matter do not rise to the level of an Eighth Amendment claim. Nothing claimed by plaintiffs is outside the scope of ordinary discomfort accompanying prison life. Surely, the segregated conditions are restrictive, but the restrictive nature of high-security incarceration does not alone constitute cruel and unusual punishment. *See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir.1999) (citing *Sweet v. South Carolina Dept. of Corrections*, 529 F.2d 854, 857 n. 1 (4th Cir.1975) (en banc)).

First, plaintiffs have not shown that conditions in administrative segregation imposed by DOP 864 categorically result in a deprivation of a basic human need. *See id.* at 471–72 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Plaintiffs do not contend that DOP 864 imposes conditions that fail to provide them with adequate food, clothing, shelter, and medical care or to protect them from harm. *See id.* at 472 (citing *Farmer*, 511 U.S. at 832, 114 S.Ct. 1970). Moreover, the "isolation inherent in administrative segregation or maximum custody is not itself constitutionally objectionable." *Id.* at 472. Second, with regard to the subjective element, plaintiffs have not shown that in promulgating DOP 864, defendants were deliberately indifferent to the plaintiffs' needs. *See id.* at 472 (citing *Wilson*, 501 U.S. at 303, 111 S.Ct. 2321). Accordingly, plaintiffs Eighth Amendment challenge to DOP 864 fails.

### 4. Fourteenth Amendment

Plaintiffs assert multiple challenges to DOP 864 on the basis of the Fourteenth Amendment. These challenges are assert-ed under both the Equal Protection and Due Process Clauses. Each will be addressed in turn.

#### a. Equal Protection

Plaintiffs assert Equal Protection facial challenges to DOP 864 on two grounds. First, plaintiffs claim a violation of the Equal Protection Clause in that their faiths are disparately impacted by DOP 864. Second, plaintiffs contend that the policy violates the Equal Protection Clause because it proscribes differing standards based on gender.

#### (1) Religious Inequalities

 Plaintiffs claim that DOP 864 has a unconstitutionally disparate impact on their faiths as compared with other faiths, and therefore the policy violates the Fourteenth Amendment. In their Motion for Summary Judgment, defendants have failed to address this issue, originally raised by plaintiff Ross. The court, however, dismisses this claim under 28 U.S.C. § 1915A because plaintiffs have failed to state a claim upon which relief can be granted. *See* 28 U.S.C. § 1915A(b)(1). In reviewing a complaint pursuant to § 1915A, a court should dismiss a prisoner complaint that is frivolous, malicious or fails to state a claim upon which relief can be granted. *See* § 1915A(b)(1). Frivolous complaints are those that are based on "inarguable legal conclusion[s]" or "fanciful factual allegation[s]." *Neitzke v. Williams*, 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (examining identical language of predecessor statute to § 1915A). Whether a complaint states a claim upon which relief can be granted is determined by "the familiar standard for a motion to dismiss under Fed.R.Civ.P. 12(b)(6)." *Sumner v. Tucker*, 9 F.Supp.2d 641, 642 (E.D.Va.1998). Thus, the alleged facts are presumed true, and the complaint should be dismissed only when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King &*

*Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

 In analyzing alleged Equal Protection violation under the Fourteenth Amendment, plaintiff must show at the outset that: (i) he was treated differently from others (ii) who were similarly situated and (iii) that such unequal treatment was the result of intentional or purposeful discrimination. *See Blagman v. White,* 112 F.Supp.2d 534, 537–38 (E.D.Va.2000) (citing *McGlothlin v. Murray,* 993 F.Supp. 389, 406 (W.D.Va.1997), *aff'd,* 151 F.3d 1029 (4th Cir.1998)).

 In the instant case, assuming without deciding, that DOP 864 treats plaintiffs differently from others who are similarly situated, plaintiffs have failed to validly assert that any unequal treatment was the result of intentional or purposeful discrimination. As the court has discussed, the record reflects that DOP 864 was promulgated due to concerns of suppressing contraband, limiting gang activity, maintaining discipline and security, and preventing inmates from quickly changing their appearance, all of which are legitimate, if not compelling, governmental and penological interests. *See Hines,* 148 F.3d at 358. Plaintiffs, therefore, have not asserted any intentional or purposeful discrimination. Accordingly, plaintiffs instant Fourteenth Amendment Equal Protection Clause contention fails to state a claim upon which relief may be granted. *See* § 1915A(b)(1).

(2) Gender Inequalities

Plaintiffs next contend that the differing standards under DOP 864 for male and female inmates violates the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs contend that female inmates could just as easily hide items in their hair as male inmates could, and therefore, there is no basis for having differing standards. Although this might be true, the record reflects that the motive behind the differing requirements was the result of VDOC experience and data that indicates that female inmates are not as violent as male inmates, and are not as prone to hide weapons in their hair or to escape.[6] Plaintiffs' challenges to the motives to the implementation of this policy, with no specific supporting factual basis will not stand. Again, as the Supreme Court has indicated, "bare allegations of malice [do] not suffice to establish a constitutional claim." *Crawford–El v. Britton,* 523 U.S. 574, 588, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). The question is, therefore, whether the objectives articulated by defendants behind the implementation of DOP 864 are sufficient to survive equal protection scrutiny.

 Parties who seek to defend gender base government action must demonstrate an exceedingly persuasive justification for that action. *See United States v. Virginia,* 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (quotation omitted). To satisfy this requirement, the State must show "at least that the challenged classification [1] serves important governmental objectives and [2] that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at 533, 116 S.Ct. 2264 (quotation omitted). Although neither the United States Supreme Court nor the United States Court of Appeals for the Fourth Circuit has yet addressed the issue of gender-based class distinction in state prison regulations, the United States District Courts for the Eastern District of Virginia and Western District of Virginia have both

---

6. Included with defendants' Reply Brief was a notarized copy of Answers to Interrogatories filed by defendant Johnson in litigation filed in the United States District Court for the Western District of Virginia. The data included in the Answers to Interrogatories, which was not considered in *Ashann–Ra* further supports defendants' statements regarding females' and males' propensity for violence in prison. The data shows that, based on records since 1989, a male is approximately four times more likely than a female to be cited in a Serious Incident Reports.

ruled that claims of gender discrimination under prison regulations must be analyzed using the above intermediate scrutiny. *See Ashann–Ra v. Commonwealth of Virginia,* 112 F.Supp.2d 559, 570 (W.D.Va. 2000) (citing *West v. Virginia Dep't of Corrections,* 847 F.Supp. 402, 407 (W.D.Va. 1994) and *Bukhari v. Hutto,* 487 F.Supp. 1162 (E.D.Va.1980)).

In the instant case, defendants have sufficiently justified, under intermediate scrutiny analysis, the somewhat differing standards DOP 864 applies to males and females. First, defendants have articulated an important governmental objective. The primary objective articulated by defendants with regard to the gender equal protection challenge is security, which is not only an important governmental and penological objective, it is a compelling governmental and penological objective. *See Hines,* 148 F.3d at 358. Even racial segregation, which requires the most stringent judicial scrutiny, can be justified in the prison environment by such "necessities of prison securit[y] and discipline." *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (quotation omitted).

In addition, the record exhibits that the discriminatory means employed by the defendants are substantially related to the achievement of those objectives. DOP 864 places somewhat more stringent hair length requirements on male inmates versus female inmates. This discriminatory effect, in light of defendants' experience and data that indicates male inmates are more violent than female inmates, is substantially related to the achievement of security in prison facilities. Specifically, if male inmates are more prone to violence than female inmates, contraband in the hands (or hair) of such inmates poses a greater security threat. Thus, in order to promote security, requiring male inmates to maintain shorter hair is a discriminatory

imposition that is substantially related to that objective.

Accordingly, DOP 864 survives an equal protection challenge based on differing standards for males and females.[7]

b. Due Process

Plaintiffs contend that DOP 864 violates the Due Process Clause of the Fourteenth Amendment in that noncompliant inmates are placed in pretrial detention, together with a loss of all privileges, before a hearing. Plaintiffs also contend that the removal of hair, without due process of law, is a deprivation of personal property in violation the Fourteenth Amendment. Finally, plaintiffs claim that they lose their good conduct allowance ("GCA") credits without due process of law, in violation of the Fourteenth Amendment.

(1) Pretrial Detention and Loss of Privileges

Plaintiffs contend that DOP 864 violates the Due Process Clause of the Fourteenth Amendment in that noncompliant inmates are placed in pretrial detention, and lose all privileges, before a hearing. This issue too, like the gender inequality assertion, was dealt with by the District Court for the Western District of Virginia. *See Ashann–Ra,* 112 F.Supp.2d at 568 (holding that DOP 864 does not violates the Due Process Clause by requiring that noncompliant inmates be placed in pretrial detention, and lose all privileges, prior to a hearing). The due process clause mandates procedural safeguards before an inmate may be punished by conditions dramatically different from the range of restraint contemplated by his sentence. *See Sandin v. Conner,* 515 U.S. 472, 486, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Changes, however, "in a prisoners' location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges—matters which

---

7. Judge Turk reached the same conclusion in *Ashann–Ra* in his consideration of the gender equal protection issue regarding DOP 864. *See Ashann–Ra,* 112 F.Supp.2d at 571–72.

every prisoner can anticipate are contemplated by his original sentence to prison—are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage prisons safely and effectively." *Gaston v. Taylor,* 946 F.2d 340 (4th Cir.1991) (en banc) (citing *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Thus, prisoner's do not retain a liberty interest against such changes upon confinement.

Plaintiffs in the instant matter have not alleged facts indicating that the penalties imposed by DOP 864 for noncompliance do anything more than vary daily routine, change conditions of confinement (including administrative segregation), and deny privileges. *See Ashann–Ra,* 112 F.Supp.2d at 568. Accordingly, plaintiffs contention that their privileges are suspended under DOP 864 upon noncompliance, without a hearing, fails to state any federal due process claim.

### (2) Deprivation of Property

 Plaintiffs next contend that their hair constitutes property and that DOP 864 unconstitutionally deprives them of this property in violation of the Due Process Clause of the Fourteenth Amendment. Plaintiffs have not clearly argued that their hair does indeed possess value of which they are being deprived. More importantly, DOP 864 does not mandate that current inmates have their hair forcibly trimmed. Inmates, under DOP 864, have the choice to remain in segregation indefinitely if they desire to remain noncompliant with the policy. There is nothing in the policy that deprives current inmates of any property, hair or otherwise. Accordingly, there can be no challenge by current inmates under the Due Process Clause for deprivation of property.

 DOP 864 does require that when inmates are initially brought into a receiving or parol violator unit, all receive haircuts and shaves and if an inmate refuses to cooperate, the use of force and restraints is authorized in order to bring the inmate into compliance with grooming standards; however, none of the plaintiffs have demonstrated standing to challenge this clause. To demonstrate standing, plaintiff must allege personal injury fairly traceable to defendant's allegedly unlawful conduct and likely to be redressed by requested relief. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Accordingly, as plaintiffs have not alleged injury, or potential injury as a result of the forcible hair removal clause, they have no standing to challenge this particular requirement in DOP 864.

### (3) Good Conduct Allowance Credits.

 Plaintiffs contend that the reclassification that can potentially accompany continued and chronic noncompliance with DOP 864 could alter their release date and custody level in the future. Plaintiffs argue that this constitutes a deprivation of a liberty interest without due process of law. Inmates have no protected liberty interest in remaining in or being assigned to a particular good conduct allowance level. *See James v. Robinson,* 863 F.Supp. 275, 278 (E.D.Va.1994), *aff'd,* 45 F.3d 426 (4th Cir.1994) (unpublished); *Alley v. Angelone,* 962 F.Supp. 827, 834 (E.D.Va.1997). While a classification change might result in the opportunity to earn more GCA credits, it does not guarantee an earlier release because prison authorities retain absolute discretion over the classification of inmates. *See James,* 863 F.Supp. at 278.

 The United States Constitution vests no liberty interest in inmates receiving a particular classification for the purpose of potentially earning an early release. *See Slezak v. Evatt,* 21 F.3d 590, 594 (4th Cir.1994) (citing *Hewitt v. Helms,*

459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). State legislatures, however, may create such a liberty interest by limiting prison officials' discretion in determining early release. *See id.* (citing *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)). The state thus creates no protected liberty interest "if under the regime either the primary decision maker or any reviewing authority is authorized to override, as a matter of discretion, any classification suggested by application of the prescribed substantive criteria." *Id.* at 595. Specifically, while the Virginia Code and relevant VDOC regulations require prison officials to provide opportunities for inmates to earn GCA credits, they also give officials absolute discretion over GCA classification. *See James,* 863 F.Supp. at 277–78; *Ewell,* 813 F.Supp. at 1182–83. Thus Virginia has not created a statutory or regulatory interest in a particular GCA classification.

 In addition, a prison regulation creates a liberty interest and implicates federal due process protections only where the regulation imposes upon the inmate conditions which dramatically depart from the expected conditions of his indeterminate sentence. *See Garrett v. Angelone,* 940 F.Supp. 933, 943 (W.D.Va.1996) (citing *Sandin,* 515 U.S. 472, 115 S.Ct. 2293). Since custody and security status and good time earning rates are subject to change, a specific change in these classifications does not implicate federal due process protections. *See id.* at 943 (citing *Sandin,* 515 U.S. 472, 115 S.Ct. 2293). As plaintiffs in the instant case are challenging the impact DOP 864 has on noncompliant inmates' security statuses and good time earning rates, their claim does not implicate federal due process protections.

Accordingly, plaintiffs fail to allege that DOP 864 infringes on a protected liberty interest.

### 5. Religious Freedom Restoration Act

Plaintiffs claims under the RFRA are essentially identical to those claims made under the First Amendment. The Fourth Circuit has recognized that the United States Supreme Court has held the RFRA to be unconstitutional. *See Hines,* 148 F.3d 353, 357 (citing *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)); *see also Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank,* 527 U.S. 627, 637, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999), *Columbia Union College v. Clarke,* 159 F.3d 151, 155, *cert. denied,* 527 U.S. 1013, 119 S.Ct. 2357, 144 L.Ed.2d 252 (1999). Accordingly, plaintiffs claims under the RFRA are summarily denied.

### B. Analysis—Implementation Challenges

Plaintiffs also assert several implementation challenges to DOP 864. Each will be addressed in turn.

#### 1. Sanitizing of Barber Equipment

 Several plaintiffs claim that several defendants, in violation of DOP 864, have failed to ensure that barbering equipment is sanitized between haircuts. Moreover, plaintiffs allege that barbers are not properly trained and are not checked or vaccinated for hepatitis. They claim that this could conceivably cause an increased risk of hepatitis contraction.

Under the Eighth Amendment, a prison official is liable for denying an inmate humane conditions of confinement if that prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Gholson v. Murry,* 953 F.Supp. 709, 723 (E.D.Va.1997) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). In a case analogous to the instant matter, an inmate alleged an Eighth Amendment violation with regard to a perceived heightened risk of contraction of tuberculosis. *See Chap-*

*man v. Plageman,* 417 F.Supp. 906 (E.D.Va.1976). The plaintiff in *Chapman* asserted that prison officials were violating the Eighth Amendment in that, based on two recent cases of tuberculosis in plaintiff's unit, the beds were placed too close together and were not sanitized when new inmates slept on them. *See id.* at 908. The *Chapman* court considered whether "the conditions described here are sufficiently shocking so as to amount to cruel and unusual punishment." *Id.* at 908. The court held that the conditions alleged by the plaintiff were "not so shocking or barbarous as to violate the Constitution." *See id.* at 907 (citing *Novak v. Beto,* 453 F.2d 661 (5th Cir.1971)).

In the instant case, plaintiffs have also failed to show that they are subject to an excessive risk that is sufficiently shocking as to amount to cruel and unusual punishment. Even assuming that hepatitis has become a problem in the Virginia prisons, barbers are not vaccinated or checked for hepatitis, and that barbers have been failing to properly sanitize their equipment, plaintiffs have not articulated any excessive risk that is so shocking or barbarous as to violate the Constitution. Plaintiffs have not pointed to one instance of an inmate contracting hepatitis in the manner alleged nor have they cited any credible source indicating an excessive risk exists. Accordingly, this claim fails.

### 2. Michigan Inmates

█ Multiple plaintiffs contend that defendants' decision to grant Michigan inmates a waiver to DOP 864 was a violation of the Equal Protection Clause of the Fourteenth Amendment. DOP 864 was not enforced in the case of Michigan inmates because these prisoners were in the process of being returned to Michigan. Since the return of the Michigan inmates began prior to the issuance of DOP 864 on November 15, 1999, compliance with this policy was waived for these inmates. The return of the Michigan inmates began on October 13, 1999, and continued until March 8, 2000, when the last 53 inmates were returned to Michigan. All other out-of-state inmates, including those from Vermont and Delaware, are required to comply with the grooming policy, just as Virginia inmates are required to comply.

█ In order to claim a valid equal protection claim, a prisoner must make a threshold showing "that he was treated differently from others who were similarly situated." *Shaheed v. Winston,* 885 F.Supp. 861, 869 (E.D.Va.1995). Generally, "in determining whether persons are similarly situated for equal protection purposes, a court must examine all relevant factors." *United States v. Olvis,* 97 F.3d 739, 744 (4th Cir.1996) (citing *Ah Sin v. Wittman,* 198 U.S. 500, 507–08, 25 S.Ct. 756, 49 L.Ed. 1142 (1905)). Plaintiffs have asserted that Michigan inmates shared facilities with Delaware inmates and were thus similarly situated. This assertion, however, is insufficient because it misses the very point that Michigan inmates and Delaware inmates came to into the Virginia correctional system from different states, and thus are not similarly situated. If plaintiffs alleged that one Delaware inmate was receiving preferential treatment to another, this may pass this threshold inquiry. Plaintiffs, however, have not suggested this. Accordingly, because Michigan and Delaware inmates are not similarly situated, plaintiffs have not met the necessary threshold inquiry and thus this claim under the Equal Protection Clause must fail.

### 3. Forced Purchase Toiletries to Maintain Compliance with DOP 864

█ Additionally, multiple plaintiffs contend that they are forced to purchase grooming items in order to be in compliance with DOP 864. With regard to razors, the policy provides that inmates who are indigent are provided with free razors each month and are able to use the prison barber shop to ensure that their appearance is in compliance with DOP 864. Plaintiffs complain, however, that they are

not always provided with razors and that as a result, they are sometimes forced to borrow razors from other inmates and that this exposes them to a heightened risk of contracting hepatitis. Plaintiffs also contend that they are not provided with nail clippers, and thus have difficulty being in compliance.

First, plaintiffs have not contended that they are unable to be compliant. Plaintiffs have been able to maintain compliance with DOP 864 by borrowing razors. Second, with regard to the risk borrowing razors may pose, if prison officials are failing to provide razors as they are directed to in DOP 864, and forcing inmates to borrow razors from other inmates, this may be an undesirable practice. A practice, however, may be undesirable and condemned but may still not be so abusive as to violate a constitutional right. *See Scellato v. Department of Corrections*, 438 F.Supp. 1206, 1207 (W.D.Va.1977) (citing *Sweet v. South Carolina Dep't.*, 529 F.2d 854 (4th Cir.1975)) (en banc). For the same reasons articulated above in the discussion of the sanitizing of the barbering equipment, the court finds the potential risk of hepatitis associated with borrowing razors, not to be such as to violate the Eighth Amendment. Moreover, with regard to the nail clippers, as defendants have asserted, nails can be trimmed without nail clippers.

4. Harassment From Officers

 Plaintiff Wells, a pre-op-transsexual, and plaintiff Batts, a homosexual, contend that they are being-harassed by guards regarding the styling and short-length of their hair, which are a result of their compliance with DOP 864. Defendants have failed to address these claims in their Motion for Summary Judgment. The court, however, dismisses these contentions because they fail to state a claim upon which relief may be granted. *See* § 1915A. Verbal abuse of inmates by guards, without more, states no claim of assault. *See Collins v. Cundy*, 603 F.2d 825

(10th Cir.1979). Accordingly, plaintiffs Wells and Batts claims are dismissed.

III. Conclusion

Accordingly, for the reasons discussed above, defendants' Motion for Summary Judgment is granted and plaintiffs' Cross-Motion for Summary Judgment is denied.